This case is Wells v. Endicott. May I please record my goal and again for the plaintiff appellant Matthew Wells in this case. I've spelled out the facts in the prior appeal of this case, so I won't dispel too much with these facts. In this appeal now, the plaintiff also filed his complaint against Sophia Rollins, who is a case worker who is in charge of monitoring the series for the Department of Children and Family Services, monitoring Joseph Schoolfield's case. Again, it's alleged in the facts of these cases, in the complaints, that Sophia Rollins had knowledge of what was happening to Joseph Schoolfield. She was present at the December 2, 2008 hearing in which Joseph was returned temporarily to the custody of his mother. It was again known that she had knowledge that Joseph was continually being abused and again did nothing about it. In my time before the court in this case, I'll show that the Circuit Court of Madison County was incorrect in dismissing the claims against Sophia Rollins for basically, again, three reasons. Number one, the Circuit Court had subject matter jurisdiction over these claims. Number two, Sophia Rollins is a person who is amendable to being sued under Section 1983. And then lastly, that physical custodial control is not the only relevant state action to consider whether or not someone's substantive due process rights have been violated. The motion that was made by Sophia Rollins in this case was brought under both 2619 and 2615. There were really no reasons given for why the claim was dismissed, why the cause of action was dismissed in the order. So as such, I'm going to address the substantive grounds first, which would be the 2619 grounds to say that there would have been no jurisdiction. The defense have argued that this is a case that's more suitable for the court claims as opposed to the Circuit Court. As this court, I'm sure, is well aware of, the United States Supreme Court has stated that in order for a federal court to have exclusive jurisdiction over a federal cause of action, Congress must have taken some type of affirmative step under exercising its powers under the Supremacy Clause to divest state courts of their presumptively concurrent jurisdiction. And that was from Yellow Freight Systems versus Donnelly. Subsequently, in Howlett versus Rose, the Supreme Court of the United States stated that both state and federal courts have concurrent jurisdiction over Section 1983 claims. Repeatedly, the Supreme Court of Illinois has stated the Circuit Courts are courts of general jurisdiction. As courts of general jurisdiction, they're presumed to be competent to hear claims that arise under federal law. Here, there's nothing in Section 1983 indicating that Congress meant to completely divest jurisdiction of state courts. It should only be brought to federal courts. So, for that reason, it would indicate that a certain court in Madison County would have had jurisdiction to hear this case. Another point goes, though, is that sometimes, as this court's recognized, even though sometimes you may have brought a claim against a state actor, that does not always necessarily mean that it's a claim against someone as an individual. Claims against the employee or an agent of the state, even if not suited to official capacity, have been held to be deemed claims against the state of Illinois if there are, one, no allegations that the agent acted outside the scope of his authority, two, the duty which was allegedly breached is not under the public independent of state employment, and three, the complaint of actions are within the employee's normal functions and normal official functions. But the Supreme Court, in the case of Healy v. Vaughn, has stated that sovereign immunity under the Court of Claims Act affords no protection when there has been an allegation that the agent of the state has acted in violation of statutory or constitutional law. In those instances, the Supreme Court held jurisdictions proper in the circuit court. That's what we have here. The plaintiff alleged that Defendant Sophia Rawlings acted in violation of constitutional law, that she violated Joseph Schoolfield's right to personal security and safety, which is a historic liberty interest that's been protected substantively under the new process clause of the 14th Amendment, and I would direct the court to see Ingram v. Wright for that proposition. Again, this is a situation where we have alleged she's acted in violation of constitutional law. As such, this is not a claim against the state. This is a claim against an individual, and as the Supreme Court directed in Healy v. Vaughn, this is something that's proper subject matter jurisdiction in the circuit court, not the court of claims. Secondly, civil rights defendant Sophia Rawlings is a person who is amendable to being sued in 1983. I've spelled out previously to this court in my briefs and in my prior argument about what it is that needs to be taken with respect to whether or not someone is sued as an individual or whether someone is sued in their official capacity. Here, the plaintiff expressly stated she's suing Sophia Rawlings as an individual. There is no allegation that Sophia Rawlings was acting in violation of some type of official policy or custom. They've alleged that acting under color of state law, she violated Joseph Schoolfield's right to personal security and safety when she failed to exercise bona fide professional judgment and she failed to intervene to protect him. And lastly, the plaintiff has asked for money damages against Sophia Rawlings. All these circumstances taken in totality when viewed under the factors set out by the Seventh Circuit, Hill v. Shelander, indicates that Sophia Rawlings has been sued as an individual. And this leads me to my last point, which is that physical custody and control is not the only state action that's considered relevant to determine whether or not someone has had their substantive due process rights filed. In the defendant's brief, Defendant Rawlings' brief, they rely heavily on the case of DeShaney v. Winnebago County Department of Social Services, Supreme Court of the United States case. In that case, the Supreme Court of the United States stated, in its substantive due process analysis, it is the state's affirmative act of restraining, and I'm quoting, it is the state's affirmative act of restraining the individual's freedom to act on his own behalf through incarceration, institutionalization, or other similar restraint of personal liberty, which is the deprivation of liberty triggering the protections of the due process clause. Defendant then goes on to argue that because Joseph Schoolfield was not in the state's custody when he was beaten and ultimately murdered by Scott Endicott, plaintiff cannot maintain any cause of action against her under Section 1983. As I stated in my brief to this court, physical custody or restraint or control over an individual has not been the only state action that has been considered relevant to determine whether a person's substantive due process rights have been filed. As I mentioned in White v. Rochford, that was a situation where the Seventh Circuit looked at what actions were taken with respect to these children to determine the constitutional significance of the state's subsequent inaction. And such an analysis has been implored by the Supreme Court of the United States in the past. Specifically, that case is Youngberg v. Romeo. In Youngberg, Nicholas Romeo, he was a profoundly retarded individual. He had an IQ between 8 and 10. He had the mental capacity of an 18-month-old child, even though he was a grown man. From the time until he was 26 years old, he lived with his mother and his father in Philadelphia, Pennsylvania. Two weeks after his father died, his mother petitioned the Pennsylvania court to have him involuntarily committed to a state facility because she was unable to care for him by herself and she could not control his acts of violence. After he was examined by a physician and a psychologist, both of whom determined that he was mentally retarded and was not able to take care of himself, Nicholas was involuntarily committed to the Pennhurst State School and Hospital. While at Pennhurst, Nicholas was injured on numerous occasions, both through his own actions and through the violence of other residents at the state hospital. Nicholas' mother became concerned about the number of injuries that he had sustained, over 63, I believe, in a two-year period. So she filed a suit on behalf of Nicholas against the officials at Pennhurst. It was interesting to know that the lawsuit that was filed on Nicholas' behalf never once challenged Nicholas' confinement to the institution. Instead, what was alleged was that Nicholas had a constitutionally protected liberty interest in safety, freedom of movement, and training inside the institution, and that Pennhurst officials had infringed upon Nicholas' rights by failing to provide constitutionally required conditions of confinement. The Supreme Court first looked and made clear in its prior decisions and dictated that Nicholas had a protected liberty interest in his own personal security and safety, be free from bodily restraint, and that these liberty interests did not dis-extinguish because he was confined to a state institution. Secondly, the court then turned to see whether or not he had the right to receive training inside the institution's borders. Generally, the court found the states under no obligation to provide substantive services for those who are inside its borders. However, the court realized that in some situations, services must be rendered to keep from infringing upon other protected liberty interests. And that was exactly what was happening in this case. Because Nicholas was seeking only training for his safety and freedom of restraint, the court found that his liberty interests required the state to provide him these trainings to minimally adequate or reasonable training to ensure the safety that he would have from undue bodily restraint. Now, if we look at this case through the lens of DeShaney, as the defendant would have us do, then Youngberg can be dismissed and explained in the following manner. Because Nicholas Romeo was involuntarily committed to the Pennhurst State School and Hospital, it was the state's affirmative act of restraining his freedom to act on his own behalf by institutionalizing him that was the deprivation of liberty that triggered the protections of the due process following the 14th Amendment, not the state's failure to act to protect him from harms inflicted by other means. This is a profound viewpoint to take, because nowhere was it ever alleged that Nicholas Romeo was challenging his confinement inside the institution. What was argued instead was that he had the right to, quote, safety, freedom of movement, and training within the institution, and that the Pennhurst officials had infringed upon him his liberty interests by failing to provide constitutionally required conditions of his confinement. Now, this does not necessarily mean that the fact of institutionalization was irrelevant to Youngberg. Quite to the contrary. It instead emphasizes the point that the fact that he was institutionalized himself would have never led to any deprivation had state officials not failed to act. Further, this fixation that the defendant has in their brief on the need for someone to be in physical custody or control of the state in order to trigger these protections from the due process clause ignores another critical factor in Youngberg. Under that view, again, looking at Youngberg through that lens, then it would say that it was the state of Pennsylvania that somehow rendered Nicholas Romeo unable to care for himself when he was involuntarily committed to the Pennhurst State Hospital. The facts underlying that case, though, completely belied that view. This was an adult man that had an IQ between 8 and 10. The fact is, this was a guy who could not have taken care of himself for quite some time, long before the state stepped into his life. As such, the institutionalization, again, was not just critical in Youngberg. It was not critical because it somehow rendered him helpless to help himself, but rather it was important because this institutionalization that separated him from other private sources of aid that the court then found the state was obligated to replace. Now, Youngberg is not alone in sounding in this theme that we should not, that we look at what actions the state has taken with respect to you to then determine the constitutional significance of your inaction. The Supreme Court of the United States has held that a state's actions may oppose affirmative duties in other cases. In Bodie versus Connecticut, for example, because the state of Connecticut had monopolized the way to dissolve someone's marriage, the court felt that they could not deny someone access to the courts of the state of Connecticut simply by having an indigent person refuse to pay for divorce, court fees and costs to get a divorce. In Schneider versus the state, this is a freedom of speech case where the court found local government could not entirely foreclose the opportunity to speak in a public forum, handing pamphlets out on the street by enacting some type of literary. Further, the Supreme Court of the United States has suggested that a state may be found to be complicit in a constitutional violation, even though it did nothing to create the situation that led to the deprivation in the first place. Two cases that the court should consider are Shelley versus Kramer. In that case, the Supreme Court was asked to determine whether or not racially restrictive covenants would violate the Equal Protection Clause of the 14th Amendment. And while the court found that the covenants themselves, put in there by private individuals, did not violate the Equal Protection Clause, if a court were to enforce these covenants, that would be sufficient state action to determine there's an equal protection violation. Same would happen in the case of Burton versus the Wilmington Parking Authority. In that case, the court held that when a state leases public property to a private entity whose conduct then results in race discrimination, the prescriptions of the 14th Amendment must be complied with by the lessee as though they were binding covenants in the agreement itself. In that case, then, there was sufficient state action as well, because of this discrimination that was taking place on the property that was leased and was owned by the public. Are these cases dispositive on the point? No. They are not in this particular case. But I do think that they're instructive, because it does indicate that there is a complete other line of cases that can be read entirely in conjunction with DeShaney that states that physical custody and control is not the only state action that's relevant to determine whether someone's substantive due process rights have been violated. And if we look at what was taking place with respect to Joseph Schoolfield, by the state actors in this case, then there's no doubt that there was a deprivation of due process here. He was twice removed from the custody of his mother due to injuries he sustained at the hands of Scotty McNaughton by the Department of Children and Family Services. When they did this, they had, as the Seventh Circuit found in a case called Cage v. Morgan, when you take someone into state custody, even temporarily, you then at least assume somewhat of a rudimentary duty to make sure that this person is kept safe in the future. Further, there was expressed knowledge that was known by Sophia Rawlings of the atrocities that were being committed on this child by having knowledge of what was happening to them and then doing absolutely nothing to protect them. That's a violation of the 14th Amendment. That's not exercising bona fide professional judgment. The Supreme Court of the United States, in a case called Davidson v. Cannon, stated that the due process clause of the 14th Amendment was intended to prevent government from both abusing governmental power or employing it as an instrument of oppression. But as Youngberg and as White and as the cases that I have pointed out to this court today indicate, inaction can be every bit as abusive of power as taking action. Employees and the agents of the Department of Children and Family Services cannot remove a child from someone's custody twice, allow him to be placed back into a dangerous situation by not testifying at hearings when they know something bad is happening to him, have knowledge again that bad things are happening to this child, and then just walk away and sit back and say, you're really in no worse position than had we ever gotten involved in the first place. As I stated previously in my rebuttal argument and the last argument, the Constitution of the United States just cannot be said to be indifferent to this type of deliberate indifference by state agents. I'll yield back at the end of my time. Counsel? Thank you, Counsel. May it please the Court, Counsel? My name is Tara English, and seated at the table with me today is Steve Mudge. We have been appointed as Special Assistant Attorneys General to represent Defendant Appellee Sophia Rawlings in this case. Our client is a social worker who was the intact family caseworker in Joseph Schoolfield's case. As Mr. Scodro pointed out earlier, the facts alleged in the Plaintiff's Second Amended Complaint, although tragic, closely mirror those analyzed by the Federal Supreme Court in the case of Deshaney v. Winnebago County Department of Social Services. And as state courts of appeal are bound to follow the U.S. Supreme Court's interpretation of the Federal Constitution, Deshaney is binding precedent here. Because the facts at hand cannot be significantly distinguished from Deshaney, the Circuit Court of Madison County correctly followed Deshaney and dismissed with prejudice the Plaintiff's claims against Sophia Rawlings. Here, the Plaintiff alleges in Count 17 of the Second Amended Complaint, which is the only count directed against Sophia Rawlings, that as a child welfare specialist, Rawlings was assigned to monitor the case opened by the Department of Children and Family Services concerning Joseph Schoolfield. When the Circuit Court returned Joseph to his mother's custody in October of 2008, the Plaintiff alleges that Rawlings violated Joseph's substantive due process rights by allowing him to remain in his mother's custody and by failing to protect him from Scott Endicott. Plaintiff's allegations, however, make it clear that the Circuit Court ordered, both in October and in December of 2008, that Joseph Schoolfield be in the custody of his mother. The United States Supreme Court set forth the general rule concerning whether a state and its actors have a duty to protect citizens from violence committed by private individuals in Deshaney. Where it held that a state's failure to protect an individual against private violence simply does not constitute a violation of the due process clause. Deshaney, like the case here, involved a child who was injured by a private individual while he was in the custody of his natural parent. In Deshaney, a county social services department received several complaints that a minor child, Joshua Deshaney, was being abused by his father. Although the department investigated the complaints and at one time obtained an order temporarily removing Joshua from his father's custody, he was returned to his father's custody and ultimately beaten so severely that his brain was permanently damaged. Joshua and his mother then brought a Section 1983 action against Winnebago County, its Department of Social Services, and various individual employees, alleging that they had violated Joshua's substantive rights to due process by failing to protect him from his father's violent acts. The district court granted some re-judgment, the Seventh Circuit affirmed, and its decision was upheld on review by the U.S. Supreme Court. In its opinion, the Supreme Court emphasized that the Fourteenth Amendment does not require the government to prevent private citizens from harming each other. Nothing in the language of the due process clause itself requires the state to protect the life, liberty, and property of its citizens against invasion by private actors. Its purpose was to protect the people from the state, not to ensure that the state protected them from each other. Therefore, the court found that the failure of the defendants to protect Joshua did not violate the constitutional right. In De Cheney, the court recognized two exceptions to the general rule that the state has no duty to protect its citizens from the acts of a private individual. First, when a state takes a person into custody, inviting him against his will. And second, when the state creates the danger or renders a person more vulnerable to an existing danger. Neither exception applies here. It is apparent from the facts alleged in the complaint that the plaintiff cannot state a claim under the first exception to De Cheney's general rule because neither the state nor Sophia Rawlings had custody of Joseph when he was attacked. As plaintiff admits on page 21 of his brief, to be sure, Joseph Schofield was in the custody of his mother, Valerie Schofield, when he was beaten and ultimately murdered by Scott Endicott. Nevertheless, plaintiff argues that Rawlings had a duty to protect Joseph because of a special relationship that he alleges arose due to the fact that the Department of Children and Family Services had on a prior occasion temporarily taken Joseph Schofield into its custody. In De Cheney, the Supreme Court explicitly rejected this argument and reasoned that while the state may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the state took temporary custody of Joshua does not alter the analysis. For when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all. The state does not become the permanent guarantor of an individual's safety by having once offered him shelter. The state's affirmative duty to protect arises not from the state's knowledge of the individual's predicament or from its expressions of intent to help, but from the limitation which it has imposed on its freedom to act on its own behalf by taking him into custody. The De Cheney court specifically described the requisite restraint by the state as incarceration, institutionalization, or other similar restraint. So what you would say is there is no cause of action for a failure of a PCFS representative to take a child into custody when they should have? I mean... There's not a constitutional violation. So if Sophia Rawlings was standing on the front porch looking through the window and both parents were beating the child, she could turn around and walk away and there'd be no cause of action? Under De Cheney, there's no constitutional action. Because she's not leaving him any worse off than when she walked up on the porch and looked through the window. Correct. The second exception to the De Cheney rule is the state-created danger exception. The state-created danger exception to this rule requires a plaintiff to plead back showing some affirmative act on the part of the state that either created a danger to the plaintiff or rendered him more vulnerable to an existing danger. In order for the state-created danger theory to be available, affirmative conduct is required. Mere inaction by state actors, even in the face of a known danger, is not sufficient to trigger an affirmative duty on the part of the state under this theory. In the case at hand, the plaintiff's allegations are all phrased in terms of a failure to provide aid or services. There are no pleadings alleging that Sophia Rawlings engaged in an affirmative act. Rather, the complaint claims that Rawlings failed to intervene or continued to allow Joseph to remain in Valerie Schofield's custody. This failure to act language is insufficient to state a duty under the state-created danger exception to the no-duty rule. Plaintiff cites White v. Rochford in support of the proposition that actual physical custody or restraint is not the only state action relevant to a determination of whether a person's substantive due process rights have been violated. Although decided before DeShaney, White is clearly a case where the state had a duty to protect the plaintiffs because it caused or contributed to the dangerous condition that led to their injuries. In White, police officers arrested the driver of the vehicle and left his passengers, three children, stranded in the car on the side of a busy Chicago highway in inclement weather. When he was arrested, the driver asked the defendant officers to take the children to the police station or to a phone booth so that they could call their parents, and the officers refused. The Seventh Circuit held that by refusing to lend police aid to the children who were endangered by the performance of official police duty, the defendant officers violated the due process clause. Police officers may not arrest a minor's adult custodian and then abandon the minor in a health endangering situation, having created the danger. Plaintiff incorrectly claims support for his special relationship argument from K.H. Thumerphy Morgan, a case where the plaintiff was removed from her parents' custody and placed in foster care. In its analysis, the K.H. Thumerphy court specifically distinguished the case from DeCheney by pointing out that this is not a positive liberties case like DeCheney, where the question was whether the Constitution entitles a child to governmental protection against physical abuse by his parents or by other private persons not acting under the direction of the state. There is no such entitlement. By contrast, the state removed K.H. from the custody of her parents and having done so, could not deliberately place her in a position of danger. White, K.H. Thumerphy, and other cases that have imposed an affirmative obligation on the state under the due process clause based on state-created danger theory are not applicable here. Plaintiff alleges at most inaction on the part of Sophia Rawlings. Absent allegations that the state had custody of Joseph Schofield or that defendant Rawlings took affirmative action to create or increase the danger he faced, plaintiff cannot state a claim. Contrary to plaintiff's assertions, DeCheney is directly on point and demonstrates the plaintiff cannot state a Section 1983 claim against Sophia Rawlings even though he phrases his claim as a failure to exercise bona fide professional judgment rather than a failure to protect. Plaintiff's argument fails to acknowledge that in Section 1983 actions, courts only analyze whether a state official exercised professional judgment after first determining that they had a constitutional duty to provide services. The plaintiff mischaracterizes law by citing Youngberg, K.H. Thumerphy, and Yvonne L. in support of his claim that a state official's failure to exercise bona fide professional judgment subjects the state official to individual liability under Section 1983. In all of the three cases cited by plaintiff, the state had physical and legal custody of the plaintiffs and because of this custody and the resulting deprivation of liberty, had a duty to protect them. In each case, only after the court had established that the state had custody of the plaintiff and therefore a duty to protect, did it discuss the exercise of professional judgment and the context of determining what standards should be used to determine whether liability could be imposed on the state official. Plaintiff's reliance on Youngberg v. Romeo is misplaced as that case held that when a person is institutionalized and wholly dependent on the state, a duty to provide certain services and care does exist, although even then, a state necessarily has considerable discretion in determining the nature and scope of its responsibilities. After considering what standard courts should use to determine whether a state has adequately protected the rights of the involuntarily committed, the court held that the Constitution only requires that the courts make certain that professional judgment, in fact, was exercised. Okay, let me ask another question. I mean, in this case, there was a pending court proceeding. Yes. And juvenile proceeding having to do with this child. And in that proceeding, Department of Children and Family Services was under an order to monitor what was happening. Is that accurate? That is what is planned. All right. Even though the child was in the physical custody of the mother, why wouldn't that be sufficient custody, the fact that Department of Children and Family Services was obligated to be monitoring what was going on? If you look at the case of Stevens v. Umstead, the Seventh Circuit considered what would be sufficient custody or restraint to give rise to a duty to protect and found there that a state had no duty to protect a blind and developmentally disabled student from being assaulted by other students while he was a full-time resident at a state school for students with disabilities. And in that case, the plaintiff was residing in the state institution, not even residing with his parents, but because the parents still had legal custody and had the option to control where the student was, the court found that the state had no duty to protect him from private actors. Let me just ask, in Descheny, was there a pending court proceeding? My impression was that all actions there were just within the agency. I think that there had been court proceedings in Descheny and that the child was removed from the home briefly and then returned to his father. None of the cases cited by plaintiffs support his claim that a child who is injured by a third party while in the custody of a parent can hold a state social worker liable under Section 1983 for failing to exercise bona fide professional judgment. In fact, Morgan and Yvonne L. both restate the rule articulated in Descheny by the Supreme Court that the state does not have a duty to protect a child who is in the custody of his parents. Here, the Circuit Court of Madison County gave custody of Joseph Schofield to his mother, Valerie Schofield, and ordered her to permit no contact between Joseph and Scott Endicott. Despite this order, Valerie Schofield gave Scott Endicott the opportunity to inflict the injuries that ultimately took Joseph's life. The state of Illinois has no constitutional obligations to protect children from physical abuse by their parents, nor does the Constitution entitle a child to governmental protection from private persons not acting under the direction of the state. Here, Sophia Rawlings did not have custody of Joseph Schofield and did nothing to create the danger he faced. Consequently, as the Circuit Court found, she did not have a constitutional duty to protect Joseph Schofield and the plaintiff cannot successfully plead a Section 1983 claim against her. Therefore, we ask this Court to affirm the Circuit Court's order dismissing the plaintiff's Second Amendment complaint with prejudice. Thank you. Thank you, Counsel. Counsel? A couple points on the rebuttal. But first is what Justice Stewart picked up on, which is that what I've been saying is that inaction can be just as abusive of power as actually taking action. It divides common sense that the law would somehow allow a worker for a state agency whose job is to protect the welfare and interests of the children to walk by someone's house, see that the child is being physically abused by both of his parents, and then just shrug their shoulders and walk away? It divides common sense that there would be no liability in that situation. It's as I just kept trying to bring to this Court's attention that inaction on the part of a governmental entity can be just as abusive of power as action. Secondly, with regard to the DeShaney case, I don't believe that there was a pending court case in that matter. I believe it was, as Justice Blackman noted in his dissenting opinion, all that the actors from the Winnebago County Department of Social Services did was dutifully take notes and did absolutely nothing to act on that. Lastly, it just goes to try to drive this point home, is that if the fire department rescues you from a burning building, that does not then give the fire department the right to burn you at the stake because, well, you're in no worse situation off than you were before. This is exactly the type of argument, though, that's being made by the defendant in this case. He was in no worse position than he was before the state got involved, and therefore we're just absolved of all liability and wash our hands of this. This cannot be the law. The Constitution cannot be indifferent to this type of indifference. Thank you. Thank you, Counsel. We appreciate the brief argument, Counsel. We'll take the case under advisory. We'll take a short recess and then have argument as well. All rise.